IN RE ESTATE OF HELEN NORMAN.
ANNA OLSON v. CLARICE NORMAN TUBBS.[1]

December 6, 1940.

No. 32,522.

[1]Reported in 295 N. W. 63.

*Daly & Barnard, D. S. Lane,* and *Oscar S. Wilson,* for appellant.
*T. O. Gilbert* and *J. O. Haugland,* for respondent.

JULIUS J. OLSON, JUSTICE.

The appeal is from a judgment entered pursuant to findings made by the court. As the issue presented is one of fact, it is necessary that these be rather fully stated:

Christian L. and Helen Norman were husband and wife. They were not blessed with "any child or children" of their own. "Between May 20 and June 23, 1895," they "received into their care and custody from some undisclosed * * * source a strange child to rear * * * 10 to 15 days old." There is nothing in the way of proof as to "the origin of the child," nor that it was "of kin to the Normans." On June 23, 1895, they caused the "child to be baptized by the pastor of the Lutheran Church of which they were members." It was the pastor's custom and duty "to write down upon the church register the short facts necessary to establish the baptismal [baptism] and the identification of any child baptized in the church." In performing this duty the pastor "erroneously" recorded June 23 as the date of its birth, whereas the true date was May 20. There is no proof in the church register or otherwise as to the names of the child's natural parents or its birthplace. The only testimony on this phase is that of the witness Mrs. Julia Nelson, who testified that when she called at the Norman home shortly after the child was brought there she said, "Well, I asked Mrs. Norman where she got her baby, and she said, 'I got her down in the cities, Minneapolis.'" Under the heading "Bemärk," meaning "remark," appearing on the register,

the pastor entered in the Norwegian language words which translated read, "Adopted by Mr. and Mrs. C. L. Norman." While the baptismal name given the child at the time of its baptism does not appear upon the church record, the fact is, so the court found, that the "child was at the baptism admittedly given" the name of "Hulda Clarice and the family name of Norman." Ever since that time and until she was married "she was [so] known and bore" that name. The register also shows that she was "confirmed" in accordance with the custom of that church on August 14, 1910. The certificate of confirmation, duly issued by the pastor, was introduced in evidence. Therein the date of her birth is stated to be May 20, 1895, that · she was baptized June 23 of that year, and confirmed August ·14, 1910. In the space provided for insertion of the name of her birthplace the same was left blank. From the time she came into the Norman home and until her marriage while away at school, she lived with the Normans, who "treated and regarded her as if she was and had been their own daughter and natural child, and that she on her part treated and regarded them as if they were her parents." And "she was always considered and known in the neighborhood where she lived as the adopted or foster daughter of the Normans." But "the neighbors at all times knew that she was not the natural child of the Normans."

Mr. Norman died testate in 1936. In his will he gave her as "my foster daughter Clarice Tubbs the sum of one hundred dollars." Proceedings were duly had in and by the probate court of that county, and the estate was duly administered there. Appellant "received, was paid and accepted said bequest of $100" so given her under the will. During the administration of that estate she did not at any time "claim or assert heirship or that she was the child or heir-at-law of said decedent."

On July 16, 1938, the widow, Helen Norman, died intestate, leaving the family homestead and certain personal property, the latter being valued slightly in excess of $6,000. (The value of the homestead is not shown.) All of this property had come to decedent

from her husband, Christian. When time came for distribution of that estate appellant intervened, claiming to be decedent's child and as such entitled to receive her entire estate. The issue of heirship lies between her and the brothers and sisters and the children of a deceased brother of decedent. So the issue here resolves itself into a determination of whether the record compels a conclusion opposite to that reached by the trier of fact. As finding No. 6 is the one against which appellant's principal attack is directed, we quote it in full:

"That no evidence whatever was offered or received tending to show that the Normans or either of them ever, at any time, in any manner contracted or agreed to adopt said child or that she should receive any or all of their property or that she should be given the rights of inheritance, or that she should be brought up by them for any length of time, therefore, it is found:

"That the said Normans did not, nor did either of them, ever at any time enter into any contract, stipulation, understanding, or agreement of any kind or character whatsoever, with the parents or parent of said Hulda Clarice, or with any other person, party, institution, or society whereby or by the terms of which they or either of them in any manner whatever promised, agreed, undertook or consented to adopt her, or whereby they or either of them in any way contracted, consented, promised or agreed that she should receive any of their property, or that she should be considered or become their heir or the heir of either of them or that she should have the rights of inheritance, or that she should be supported by them for any term of years or for any length of time."

At the time appellant came into the Norman home the statutory procedure for adoption and the rights of one so adopted were as found in G. S. 1894, §§ 8016 to 8024, inclusive. Section 8021 provided that "a child so adopted  *  *  *  shall be deemed  *  *  *  the same as if he had been born to" his adopted parents "in lawful wedlock; except that such adoption shall not, in itself, con-

stitute such child the heir of such parent or parents by adoption." And thus the law remained until enactment of R. L. 1905, § 3616, which provided:

"Upon adoption such child shall become the legal child of the persons adopting him, and they shall become his legal parents, with all the rights and duties between them of natural parents and legitimate child. By virtue of such adoption, he shall inherit from his adopting parents or their relatives the same as though he were the legitimate child of such parents, and shall not owe his natural parents or their relatives any legal duty; and, in case of his death intestate, the adopting parents and their relatives shall inherit his estate, as if they had been his parents and relatives in fact."

In Sorenson v. Rasmussen, 114 Minn. 324, 131 N. W. 325, 35 L.R.A.(N.S.) 216, it was held that this section "applies to all adopted children, whether adopted prior or subsequent" to the passage of that act. And thus in substance and effect the law has remained to this day. McKeown v. Argetsinger, 202 Minn. 595, 599, 279 N. W. 402, 116 A. L. R. 398.

Appellant's contentions may be thus summarized:

(1) "The evidence, and permissible inferences therefrom, compel a finding of an executed contract of adoption"; and (2) that the Normans, if now living, "would be estopped from denying a completed contract to adopt," and since they have now died there is an "estoppel in pais" applicable "more strongly against" their "collateral heirs * * * than against the parents" were they now living.

The record is barren of proof that a contract to adopt was made between the Normans and the natural parents of Clarice, or that any such agreement or arrangement was made for or in her behalf at any time by anyone. Admittedly she was but a babe in arms when she came to the Norman home. How and when did such contractual relationship come into being? The

record is wholly silent on this important phase. All she relies upon is the fact that she was received in the Norman home in infancy; that from that time and until she married at the age of 18 years while away from home and at school she was treated by them with the same kindness and consideration as if she were their natural child. But as was said in In re Estate of Hack, 166 Minn. 35, 37, 207 N. W. 17, 18 (a case where the facts are in principle similar to those here appearing):

"Whenever, in the absence of an adoption pursuant to some legislative enactment, a child, received from the natural parents into the home of foster parents and treated by the latter as a natural child, has been allowed to share in the estate left by the foster parents, it was only where a contract to legally adopt such child or to give it a share in such estate is clearly proven. * * * Simply that a child of another is received into a home, cared for and educated until the age of 16 years, cannot well indicate that such a child has further claims upon those who so took it in. No doubt such a child has received much more than it has parted with."

█ The burden of proof rested upon appellant to meet the requirement that "adoption contracts must be clearly established to permit enforcement thereof or recovery thereon" and that:

"A person seeking to share in the estate of another, by virtue of deceased's contract to adopt claimant, must establish the contract to adopt by clear and convincing proof. * * * and the proof must show not only that a contract existed, but that the particular contract alleged existed. Under this rule relief should be cautiously granted, and each case must rest on its own facts." 2 C. J. S., Adoption of Children, § 26(2)(a), and cases cited under notes.

While appellant relies heavily upon Laird v. Vila, 93 Minn. 45, 100 N. W. 656, 106 A. S. R. 420; Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455; and In re Estate of Firle, 197 Minn. 1, 265 N. W.

818, an examination of each of them reaffirms the rule (93 Minn. 51, 100 N. W. 658) "that the proof to sustain such an agreement must in all particulars be clear, positive, and convincing. The necessity of requiring a strict degree of proof to establish an issue of this character is too patent to warrant extended elaboration."

The Firle case is probably the nearest in its facts to the instant case. There the proof was (197 Minn. 3, 265 N. W. 819) that the child was taken from the Bethany Home, "a home for orphan children, to the home" of the Firles. "It was the custom of the home to require people to adopt children whom they took from the home. They 'were supposed to adopt them.'" In a letter from the home to the Firles it was said: *"You will have to adopt him as a deserted child as no one has any claim on him."* (Italics supplied.) The Firles took the child with that understanding. Other facts in the case, not necessary to repeat here, strongly supported the trier of fact in finding that there was abundant corroborative evidence of the existence of a contract "to adopt between the Bethany Home and the Firles." Even a casual reading of that case is sufficient in our view clearly to distinguish it from the facts here presented.

■ As tending to support the trial court it is to be noted that Mr. Norman in his will, made December 10, 1926, and prepared by an experienced lawyer, characterized her as "my *foster* daughter." The italicized word has significance which cannot be overlooked. In Webster's New International Dictionary (2 ed.) 1935, "foster" is thus defined:

"Affording, receiving, or sharing nourishment, nurture, or sustenance, though not related by blood or * * * by ties of nature * * * or the like. Hence: foster mother or father, a woman or man who has performed the duties of a parent to the child of another by rearing the child as an own child; * * * foster child, daughter, * * * one who has been cared for by a foster parent."

And see definition in Funk & Wagnalls Standard Dictionary:

"Foster, to provide with food; nourish; rear; aid; encourage; fosterage—the care of a foster child, foster brother, foster sister, foster father, foster mother, foster parent, etc.—one considered as holding the relationship indicated in consequence of nursing and rearing, though not related by blood."

That the scrivener well knew the legal distinction between a "foster" child and an "adopted" child is obvious. "Technical words which have a definite and well understood meaning will be presumed to have been used in that sense in the absence of surrounding circumstances or context which show that a different meaning was intended." In re Trust Under Will of Holden, 207 Minn. 211, 216, 291 N. W. 104, 107.

Then, too, there is ample proof that Mrs. Norman frequently stated to her friends that Clarice was not an adopted child and that she had no interest in any of her property; also, that on several occasions she expressed the purpose of so leaving her property that it would go "back to her [own] folks"; that "Clarice has got nothing to say. I do as I please. She is not adopted you see"; "I suppose I could help them [referring to Clarice and her husband] but they have gotten all they are going to get from me"; that "Clarice has gotten all she was supposed to have and still she isn't legally adopted." The statements in the will of Mr. Norman and those made orally by Mrs. Norman indicate, if they do not establish, that they considered Clarice not as one of their own— but rather as a "foster" than as an "adopted" child.

■ We conclude that the findings and resulting judgment are abundantly sustained by the evidence. This being so, appellant's claim of estoppel necessarily falls. There being no contract to adopt, there can be no estoppel against asserting its nonexistence.

Judgment affirmed.