IN RE ESTATE OF JOHN J. BERGE.
MYRTLE HALVERSON AND ANOTHER v.
JOSEPH J. BERGE AND OTHERS.[1]

April 13, 1951.

No. 35,455.

[1]Reported in 47 N. W. (2d) 428.

*John T. Kenny* and *Harold J. O'Loughlin*, for appellants.
*Sonnesyn & Lefler* and *A. P. Frankberg*, for respondents.

LORING, CHIEF JUSTICE.

This action arose out of probate proceedings relating to the estate of John J. Berge, who died intestate February 21, 1948. September 13, 1949, the administrator of Berge's estate filed his final account in probate court and in his petition for settlement recited:

"That the decedent died * * * intestate, and left him surviving Myrtle Halverson and Carrie Halverson [appellants], common law adopted children, who are the sole heirs at law of said decedent, and the persons entitled to the residue of said estate."

Objections to this allegation in the petition were filed on behalf of respondents.

A hearing was had in the probate court, and an order was entered determining that respondents are the legal heirs entitled to decedent's estate. No record was made of the testimony adduced at the hearing before the probate court. Appellants then appealed to the district court, and a trial *de novo* was had there upon all the files and records in the probate proceeding and upon facts stipulated to be in accordance with those established in the probate proceedings. The district court made findings of fact, conclusions of law, and order for judgment affirming the order of the probate court. The district court's findings were subsequently amended pursuant to stipulation of the parties, and this appeal has been taken from the judgment entered upon the district court's order.

Respondents are decedent's only blood relatives. Respondent Joseph J. Berge lives in Canada, and the other respondents live in Norway.

Appellants are stepchildren of decedent. Their mother, Mary Simonson, was married to decedent in 1910. Although appellants went to live in decedent's home in 1910, decedent never adopted them by statutory proceedings. Appellant Myrtle Halverson lived in decedent's home from the time she was aged seven until she was married at the age of 17. Appellant Carrie Halverson lived in decedent's home from the time she was aged eight until she was married at the age of 20. Appellants were supported and educated by decedent during the time they lived with him, and they, in turn, helped in decedent's home and on his farm. They never took statutory proceedings to change their surname to "Berge," but in the community where they lived they were generally known by that name. The records of their church show that both appellants were confirmed by their surname "Simonson" rather than by decedent's surname. Their marriage licenses list the surname "Simonson." On the birth certificates for Carrie's two children, her maiden name was listed as "Berge," but one of the certificates was later changed to read "Simonson."

There is no claim or proof of any specific oral or written contract to adopt appellants or to make them decedent's heirs. Appellants' entire contention is that the circumstances of their living and working for decedent, when taken in connection with certain words and acts of decedent, indicate that he agreed to adopt them or to make them his legal heirs. The words and acts relied upon are summarized as follows:

(1) Decedent caused a tombstone to be erected over his grave describing him as "father." At the time decedent ordered this done, he asked Carrie's husband whether appellants thought it was appropriate.

(2) Decedent, at the time of his wife's death, offered to give appellants some bonds, which they declined to take. They said that he might need them. In answer to this, decedent said, "You will get everything, so it makes no difference." He told of this incident at other times and made the same remark about appellants'

getting everything. He also stated that he would not consider going to Norway to live with his relatives, that he had no interest in them, and that he would like to live with appellants, as they wished, but he did not want to live in the city.

(3) After decedent's wife died in 1946, he stated that everything he had would go to appellants and that he should put his things in shape and prepare a will giving everything to them. He referred to appellants at the time as "my girls."

■ It is well settled that where one seeks to establish a contract to adopt the burden of proof rests upon him to do so by clear and convincing evidence. Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455; In re Estate of Norman, 209 Minn. 19, 295 N. W. 63. In 2 C. J. S., Adoption of Children, § 26(2)(a), the statement is made that:

"* * * If the alleged contract is oral, * * * the proof of it must be so clear, cogent, and convincing as to leave no reasonable doubt as to its existence and terms, *and the proof must show not only that a contract existed, but that the particular contract alleged existed.*" (Italics supplied.) (The italicized language has been quoted with approval by this court in In re Estate of Norman, 209 Minn. 19, 24, 295 N. W. 63, 66.)

In the present case, the record is barren of any evidence to prove (a) who the exact parties to the alleged agreement to adopt were, (b) when or where it was made, or (c) that anyone acted in such a manner that the existence of such an agreement should be implied. On page 22 of their brief, appellants frankly state:

"* * * If there had been any expressed agreement to adopt these girls [appellants] between Mr. Berge and his wife, their mother, evidence of such expressed agreement is not available, * * *."

In the Norman case, where a contract to adopt was alleged, this court stated (209 Minn. 23, 295 N. W. 65):

"The record is barren of proof that a contract to adopt was made between the Normans and the natural parents of Clarice, or that

any such agreement or arrangement was made for or in her behalf at any time by anyone."

In those circumstances, the court sustained the trial court's finding that no contract to adopt had been made. Since in the present case it is conceded that no evidence is available to prove that decedent expressly agreed to adopt appellants or make them his heirs, we think that the Norman case is controlling here, unless there are other facts which clearly and convincingly support an inference that such a contract was made.

■ Although appellants suggest that the lack of evidence to prove that the alleged contract was made may be due to the death of appellants' mother and that there are other facts from which the existence of the alleged contract should be inferred, it appears to us that the facts referred to are so equivocal that they fall far short of the required proof by clear and convincing evidence.

The fact that decedent offered to make gifts to appellants is evidence of a cordial relationship existing between them and their stepfather, but it is hardly evidence of a contract to adopt. The fact that decedent expressed a lack of interest in his blood relatives and that he frequently expressed the intention of leaving everything to appellants is evidence of his then existing state of mind, but it is not clear and convincing evidence that he executed his intentions by agreeing to adopt appellants or by making them his heirs.[2]

Decedent's statement that he should put his things in shape and prepare a will giving everything to appellants is more consistent with the absence of a contract to adopt than with the existence of such a contract. Obviously, there would be less occasion for a will if a contract to adopt existed than if it did not.

---

[2]Compare Hanefeld v. Fairbrother, 191 Minn. 547, 254 N. W. 821, where an attempt was made to prove an oral agreement to make a will. There the court held that oral and written statements made by the decedent concerning his intentions or plans for disposition of his property were not evidence of a contractual obligation.

The fact that decedent directed that his tombstone be inscribed with the word "father" is equivocal at best; and, so far as he was concerned about the appropriateness of this direction, he would hardly have thought it less appropriate if he had agreed to adopt appellants.

The mere fact that a child is received into a home, supported, and educated is not sufficient to show an implied agreement to adopt such child. In re Estate of Norman, 209 Minn. 19, 295 N. W. 63. In re Estate of Hack, 166 Minn. 35, 37, 207 N. W. 17, 18, includes the following statement on this matter:

"* * * Simply that a child of another is received into a home, cared for and educated until the age of 16 years, cannot well indicate that such a child has further claims upon those who so took it in. No doubt such a child has received much more than it has parted with."

Likewise, the fact that appellants worked in decedent's home and on his farm does not raise an inference that decedent agreed to adopt them. Willingness to perform work for those who support and educate them is not a peculiar characteristic of adopted children. It is normal to expect this whatever the status of the child may be.

In McCarty v. Nelson, 233 Minn. 362, 370, 47 N. W. (2d) 595, 599, where the facts were strikingly similar to those relied upon in the present case, this court stated in dictum:

"* * * Viewing the testimony * * * in its most favorable light for plaintiffs, * * * it does not prove that Mr. Sansbury ever promised or agreed to adopt plaintiffs * * *."

The present case obviously is not in the same category with Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455, and In re Estate of Firle, 197 Minn. 1, 265 N. W. 818, upon which appellants have relied. Both cases are readily distinguishable from the present case with respect to the kind of evidence adduced to prove the existence of the contract to adopt.

In the Fiske case, the record discloses that three witnesses testified to the fact that a written contract for adoption had been executed, and one witness testified that he had actually seen the written contract at least three times.

In the Firle case, the child was taken from an orphans' home where it was customary to require that children given into private homes be adopted. A letter was introduced in evidence to prove that the orphans' home had corresponded with the alleged adopting parents with reference to adopting the child.[3]

Although appellants have strongly urged that we should apply the equity maxim that equity regards as done that which ought to be done, it is perfectly clear that the maxim referred to cannot operate to make a contract for a deceased person where there is no rule of law or equity to support the contention that he ought to have made the contract in his lifetime.

Affirmed.

[3]In re Estate of Norman, 209 Minn. 19, 295 N. W. 63, distinguished the Firle case, as we have done here, by stating that in the Firle case there was abundant corroborative evidence to prove the existence of the alleged contract to adopt.