## CYTHIA KINS v. A. GINZKY AND ANOTHER.[1]

January 12, 1917.

Nos. 19,946—(78).

**Specific performance — contract to give house — finding unsupported.**
The finding that plaintiff came to live with the defendant's testate under an agreement whereby she was to receive a residence if she continued to so live while single, is not supported by the evidence.

Action in the district court for Ramsey county against defendants as executors of the last will and testament of Emma A. Ford, deceased, to obtain the decree of the court that plaintiff was the owner of a certain city lot belonging to testator and that the legatees named in the will had no interest therein. The case was tried before Orr, J., who made findings and ordered judgment in favor of plaintiff. From an order denying their motion for a new trial, defendants appealed. Reversed.

*Hermon W. Phillips* and *S. R. Child,* for appellants.
*Thomas C. Daggett,* for respondent.

HOLT, J.

Orville C. Ford and his wife were living in the little town of New Centerville, Wisconsin, in 1879. Mr. Ford kept a store. The Fords were childless. They became attached to Cynthia Hampton, an eight year old girl of a neighbor, a laborer having a large family, and offered to take

[1]Reported in 160 N. W. 868.

this girl into their home.  It was done.  The girl, this plaintiff, was treated by the Fords as if she had been their own child in the way of home, clothing, schooling and attention, and in return assisted in such household duties as a child of that age might do.  This continued for four or five years, when the Fords moved to Cooperstown, North Dakota.  Cynthia did not go with them, but returned to her parents.  Within a year Mrs. Ford sent for the girl, and she came, staying with them at Cooperstown for about two years, until called home by the illness of her mother.  She then remained with her parents in Wisconsin for several months.  In the meantime the Fords had disposed of their business in Cooperstown and had decided to take up their residence in St. Paul.  This was about 1889 or 1890.  The testimony leaves dates and the length of plaintiff's stay at the different places in uncertainty.  Mrs. Ford again besought Cynthia to come and live with them at St. Paul.  At this time it is claimed that the agreement, upon which this action is based, was made, namely: That the Fords would give her by deed or will a home, that is, a residence, if she stayed with them until she married.  The court found that such oral agreement was made and that in reliance thereon plaintiff came to St. Paul, took up her home with the Fords, and performed her part of the agreement until shortly before her marriage in 1894.  The evidence leaves the matter in doubt whether she left the Fords six months or two years previous to her marriage.  Mr. Ford died in 1908; and Mrs. Ford in 1914, testate.  It is claimed by plaintiff, and found by the court, that Mrs. Ford after her husband's death designated the home at 463 Wheeler avenue, St. Paul, as the property to be given plaintiff in fulfilment of the agreement.  This action was brought against the executors of Mrs. Ford's estate for specific performance of the alleged agreement. The findings were in favor of plaintiff.  Defendants' motion for a new trial was denied and they appeal.

Many errors are assigned as ground for the reversal of the order appealed from.  Only one need be considered, for we have concluded, after a careful examination of the testimony, that there is not sufficient support in the record for the basic finding that an agreement was made to give plaintiff a residence or home.  Where it is sought to establish by parol a contract of the sort here involved, the proof must be clear, positive and convincing.  Stellmacher v. Bruder, 89 Minn. 507, 95 N. W. 324,

99 Am. St. 609; Laird v. Vila, 93 Minn. 45, 100 N. W. 656, 106 Am. St. 420; Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455; Brasch v. Reeves, 124 Minn. 114, 144 N. W. 744. It must also be so specific and distinct in its terms as to leave no reasonable doubt as to its meaning. Berndt v. Berndt, 127 Minn. 238, 149 N. W. 287. There is no pretense that, when plaintiff first went to live with the Fords, there was any understanding that she was to receive any gift or that she should inherit or be adopted. Nor is it intimated that any such understanding existed during her stay with them in North Dakota. Taking her story now as true and there is no one to contradict her, she there worked very hard and faithfully for her keep. She assisted both in the household and in the business. Mrs. Ford was then conducting a millinery store, and Mr. Ford was selling farm machinery. There is no hint that any pay or reward was coming to plaintiff for the work in Dakota. The alleged agreement was made, if at all, when Mrs. Ford visited New Centerville for the purpose of getting plaintiff to come and make her home with them at St. Paul. Those present at the interview were Mrs. Ford, plaintiff, her mother, and, at one time, her father. Plaintiff of course did not attempt to testify to this conversation. Mrs. Hampton, her mother, testified that Mrs. Ford "wanted her (Cynthia) to come and live with her as long as she was single, if she would, and would provide for her and see that she had a home when she settled everything." Asked to state the conversation at another time, when probably Mr. Hampton was present, she said that Mrs. Ford said "nothing only that she was to provide a home for her, and she said that when—she would see that she had a home, when she was there." Mrs. Hampton testified to another subsequent time, when about the same words were used, and also to some time three or four years prior to the trial when Mrs. Ford said to her that she was going to give plaintiff a home "on Wheeler avenue * * * she had three homes out there, and she intended Cythia should have a home." Mr. Hampton comes nearer to testifying to a distinct and definite agreement. He testified that when Mrs. Ford came "and asked for her to go and live with her, she wanted our consent, you know, why, I talked with her and she says, if we would let her go; and I told her I didn't care much about letting her go, she was [so] young, and going off that way, you know. She said if I would let her go she would see that she had a good home, when she died,

why, she would give her a good home." But when his entire evidence is read one cannot escape the conviction that his memory is much impaired and very unreliable. He is contradicted by plaintiff and her other witnesses in almost every particular. It is to be noticed that the only construction which one may safely place upon Mrs. Hampton's account is a promise to provide plaintiff with a good home while she remained with the Fords. And what were the probabilities of the Fords in 1890, or thereabouts, making a promise to give plaintiff a house and lot or a homestead? There is no evidence that at that time they had any means to speak of. Mr. Ford was then a traveling salesman. The family then rented three rooms, and a few years later five rooms in a portion of St. Paul not occupied by the well-to-do at that time. The first piece of real estate the Fords owned in St. Paul, or anywhere else so far as this record shows, was purchased in 1902. After that three or more lots were bought in the Merriam Park district and apparently dwellings built thereon. It is not likely that persons without a home themselves, and without prospects of possessing one for years, would make an agreement to present a young woman with a residence simply upon a consideration of so doubtful value as a promise to live with them so long as she remained single. The performance of the promise was not to await any other contingency than plaintiff's marriage, except for the remark made by Mr. Hampton that the home was to be provided at Mrs. Ford's death. Any sane person would appreciate what an inducement to a speedy marriage such an agreement would be. The object of the Fords was evidently the reverse, namely, to keep plaintiff as a member of the household for as long a time as possible. Other circumstances tend to show that plaintiff herself did not entertain the thought that any agreement of the kind was in existence. If there had been we would expect plaintiff to have been very attentive to the Fords, and to have at all times cultivated their good will. But we find the Fords did not attend her wedding. There were practically no visits or intercourse between the families until after the death of plaintiff's husband in 1901. Then, left with four small children, her need appealed to the Fords and some assistance was given her. This aid and friendly visits increased very much after Mr. Ford's death. During the latter years of her life Mrs. Ford, undoubtedly prompted by the fervor with which she embraced the tenets of a new religious sect, was casting about to do good

to her friends and followers. Her five wills made between 1909 and 1913 indicate this. She expressed to three or four persons an intention to give plaintiff a home. One witness says it was on condition that plaintiff should not remarry. She, however, in June, 1914, did remarry. In these statements to others of her intentions toward plaintiff there was no admission or suggestion that the intention was based on any previous agreement, except in the testimony given by plaintiff's sister to the effect that in the fall of 1912 Mrs. Ford said to her: "I always promised Cynthia a home, and I'm going to give her one. * * * I'll wait until she is older and the children are older and they will appreciate it more. * * * I think I'll give her the home I'm living in."

It seems that in 1898 the Fords, through plaintiff's mother, procured Ruth Williams, a young woman of 17, from New Centerville, to make her home with them. She virtually filled the place plaintiff occupied in the home when there. Miss Williams remained with them nearly 12 years, or until she married in 1909. On his deathbed Mr. Ford seems to have exacted a promise from his wife to convey one of their houses to Miss Williams. This was afterwards done and probably before the next to the last will was made in August, 1911, since in the preceding wills this house and lot were in each instance devised to Ruth, then Mrs. Reynolds. Some time thereafter in March, 1912, Ruth and plaintiff had some dispute. Knowledge of this came to Mrs. Ford, and so plaintiff on March 8, 1912, writes her: "Since the little spat which Ruth and I had last Sunday I have thought seriously over my rash words and actions. * * * Since you called me up Monday and threatened to take my name out of your will, if I carried out my threat against Ruth, that led me to presume that I am really remembered in your will, though I have been laboring under the impression for some time that I was not so favored. Now, whether or not I am to be a beneficiary of your will, would make no difference in the love and affections I have for you, but since God has favored and blessed you in bestowing upon you so much of this world's goods, enabling you to live comfortably, peacefully and happy, and, it is your intention to remember me in your will, why wait until you are called from earth to glory—why not bestow upon me, while you live, whatever I am to have at your death? I am as needy now as I am likely to be then and you can have the satisfaction, while living, of seeing my numerous wants, for

myself and family, supplied by your munificence. You have had the pleasure of providing for Ruth and Willie and must have derived much satisfaction therefrom. So why not have that same pleasure for doing for me while you live whatever you intend to do at your death? Would it not be better to relieve my necessities now? I may be called before you. * * * What you have is your own to dispose of as you please, and that is as it should be, and I would not presume to offer any advice along that line, but I do think I am as worthy of becoming a recipient of your bounty as any one who has been heretofore. The only point I wish to gain is that if you intend to help me, and mine, do it now while you live, as I am so in need of help while all my children are small." To this Mrs. Ford on March 10 replied: "Don't worry, I will not take your name off my will, I will give you just what I promised you while here." Two months thereafter Mrs. Ford made her fifth and last will, and, instead of omitting plaintiff, she gave her therein $300, in place of $200, the amount given her in each of the prior four wills. We cannot reconcile plaintiff's letter of March 8, 1912, with the existence of any agreement performed by her under which she could claim a residence or home from Mrs. Ford. If such agreement was made she knew its terms, and, with such knowledge, no letter such as the above would ever have been penned by her. It is imposing too much upon the credulity of courts to request them to accept as verities the dim and uncertain recollections of two old people concerning conversations had more than 20 years ago as against the written statement of the party most vitally interested in and present at such conversations, made when no lawsuit was thought of and when there was no inducement to state anything but the truth. The main fact upon which plaintiff's right to a decree must rest is not proven with any degree of certainty, indeed we think it clearly appears that plaintiff did not come to St. Paul upon any agreement whereby Mrs. Ford bound herself to deed or devise plaintiff a residence.

The order is reversed.