# EDMUND T. CARLSON v. HARRY W. CARLSON AND OTHERS.[1]

November 28, 1941.

No. 32,933.

*Fred N. Peterson,* for appellant.

*Reuben G. Thoreen* and *Wilson & Lehmicke,* for respondents.

JULIUS J. OLSON, JUSTICE.

In a suit to compel specific performance of an oral contract to make a will, the court found "that plaintiff has failed to prove the agreement alleged in  *  *  *  his complaint or any other en-

[1]Reported in 300 N. W. 900.

forceable agreement by the kind and character of evidence which is required by law," and hence that "there was no such agreement" made. Judgment of dismissal was directed, later entered, and plaintiff appeals.

The parties to this suit are the children of John A. and Mary Carlson. The mother died intestate in 1919 possessed of an 80-acre homestead, appraised value $10,000. She was survived by her husband and the five children named in the title of this suit. On March 22, 1920, the probate court entered its decree assigning a life estate to the husband, remainder to the children in equal shares. On January 14, 1920, after Mary's death but before entry of decree, plaintiff and the other children, their spouses joining, conveyed their interests to their father, thereby vesting in him sole ownership. The present suit arises out of a claimed oral agreement made between plaintiff and his father, "on or about the 14th day of January, 1920, * * * whereby," so it is alleged, decedent "agreed to testamentarily dispose of his property in an equal share to the plaintiff with his other surviving children and further agreed to testamentarily pay to plaintiff the one-fifth interest" of his mother's estate, "in consideration that plaintiff would execute a deed and convey" his interest in his mother's estate to his father.

The father died testate March 8, 1940. By his will, dated June 25, 1923, when he was 68 years of age, he gave to plaintiff and his brother Richard each $1,000. To the daughter was given $2,000, and to each of the other two sons, Harry and Ernest, he gave a like amount, and also made them residuary beneficiaries. The appraised value of the estate is $15,400, consisting of personal property only. The will was duly admitted to probate without objection by anyone and is now being administered there. What plaintiff seeks is to have his father's will "declared null and void," and that all of decedent's property "be held in trust for the benefit" of plaintiff "in such sum as shall be found due" him.

While Richard and Mable are both made parties defendant, neither answered, for the obvious reason that each had commenced

a similar suit seeking the same relief as that asked by plaintiff. All three cases were on the calendar for trial. The answering defendants moved to consolidate the three cases, but plaintiff objected because "these actions are predicated upon a conversation with a deceased person * * * and I figured on making three suits out of it and to call the defendants under cross-examination under the statute"; if the cases were consolidated "it would close the [plaintiff's] door of evidence. * * * These actions are already separated, and in the furtherance of justice these actions should not be consolidated unless the defendants would waive that statutory prohibition about testimony as to conversations with a deceased person." Defendants refused to waive this statutory requirement, and, after considerable discussion by counsel, the court ruled that the motion to consolidate should be denied since the respective plaintiffs "are not relying on the same conversation in their claims [therefore] they would not in any manner be interested [in the result of this suit]—they have nothing to gain or lose."

The only testimony for plaintiff in support of the alleged contract between himself and his father was that of plaintiff's wife and one Helen Peterson. That conversation took place after the mother's death and shortly before the date of executing the deed, while the father was visiting at plaintiff's home. Plaintiff and his father had a "private talk" about the mother's estate. After this talk, both plaintiff and his father came to the living room, and, according to the testimony of plaintiff's wife, this is what took place:

"Well, my husband said: 'I understand that it is the will of all the children; that they are all satisfied to do that; to sign over their mother's share of the Carlson estate—of their mother's estate to the children and that they all agree to that.'" And further: "I understand—do I understand that right; that each of us children are willing to sign over our mother's share?" Plaintiff is further quoted as having said: "It was the agreement of the children to sign over their share of their mother's to their father's

with the understanding that after his death that they should be equally divided amongst them, and also after his death they should be equally divided, and too my husband asked if this was so and he [the father] says, 'Yes. You can take my word for it.' He wanted it equally divided."

Miss Peterson testified that plaintiff said to his father:

" 'Do I understand that if I sign over my mother's share of her estate that after your death it will be divided equally between we five children, both her estate and my estate?' And father answered: 'That is right.' "

There was never any talk about making a will, much less any agreement or contract between plaintiff and his father or between any of the children and their father that a will should be made. Richard's testimony does not help plaintiff. Neither he nor the daughter was present when the supposed conversation between plaintiff and his father took place. The same holds true of Mable's testimony. Both witnesses stress only their own interests, founded upon other conversations than that upon which plaintiff relies. The witness Lundquist testified that the father made no mention of any agreement between him and any of his children. All he testified to was a purely casual conversation he had with the father some 16 or 17 years after Mrs. Carlson's death. And this is his testimony:

"Well, I met him there and bid him the time of day and the old fellow seemed to be a little stirred up. I didn't realize what about and he said something about—apparently there was some trouble about something and the old fellow says to me—he said: 'You know, Oscar, one of my children is just as good as the other one, and I would like to share and share alike.' But he used some cuss words in there that I didn't use because he sometimes did that."

The testimony of the witness Kaercher took place in her "backyard * * * about nineteen thirty-six or seven" when the father

is reported to have told her: "If I ever pass away my children shall be divided equally; everyone is supposed to have the same amount." Alvin Carlson, Mable's husband, knew nothing about any agreement between any of the parties. All he testified to was a conversation had in 1939 when "him [the father] and I walked along the road and the old man told me something had to be done [about the farm] because they going to share alike in it." Defendants Ernest and Harry were called by plaintiff for cross-examination under the statute. They testified that they were not present at any of the claimed conversations testified to by other witnesses. Ernest said that he had never had any conversation with his "father relative to the disposition" of the mother's estate.

Both of these men were, of course, prevented from testifying to any conversation had with their father since they were directly interested in the result of the suit. But this much appears: Defendant Harry and his sister Mable signed the deed on January 14, 1920, at the attorney's office where the deed had been prepared pursuant to the father's instructions. Nothing was said, so Harry testified, by either of them as to any condition, contract, or agreement with anyone. The grantee was not present. All that took place was that "he [the attorney] just read us the deed and he asked us if we understood what we were signing." Nothing was said by Mable or anyone "about any agreement." Harry's wife testified that she was present when the father "asked us if we would sign the deed because he wanted a clear title so that if he wanted to sell why he could do so."

Q. "What did your husband say?

A. "He said we would.

Q. "And after that did you come to my office and sign this deed?

A. "Yes, sir.

Q. "And that was pursuant to that conversation that you have now testified to?

A. "Yes, sir."

Some three days later the other children and their spouses executed the deed at the attorney's office. The attorney who prepared the deed testified that he had no conversation with any of the grantors "outside of perhaps ordinary conversation, showing them where to sign." Nor is there any evidence that the members of the family ever met as a group to consider or discuss what, if anything, was to be done with regard to the remainder interests they had in their mother's estate.

We have recited the record at perhaps too great length. Our reason for so doing is that the determinative question is one of fact, involving, as must be apparent, the question whether the modest estate left by Mr. Carlson is to be distributed under the terms of his will or virtually as intestate property. As we have seen, the will was made about three years after the alleged agreement with plaintiff was made, so we may safely assume that the father was well aware of and distinctly remembered what agreements or contracts he had made with his own children. To him that must have been a vital matter. He was then more than 68 years of age and as such knew that his remaining years were rapidly drawing to a close. True, he actually lived almost 17 years more, yet he never changed his mind. The will remained as first written. It stands unchallenged as his *last will.* Nowhere in the record is there so much as a suggestion that testator was forgetful, absent-minded, partial to any of his children, or that in making his will he was at all influenced by any of them. The will itself furnishes eloquent testimony that he deemed himself free to act in disposing of his property. It speaks for him in the language he used as fully as if he were still with us capable and permitted to speak.

The decisive and only question is, in the language of the court, whether plaintiff has established an "enforceable agreement by the kind and character of evidence which is required by law."

■ The "kind and character" of proof required in cases of this kind is well settled by an unbroken line of our decisions. It is this:

"There must be full and satisfactory proof of the fact of a contract and of its terms before there can be specific performance. If the contract is sufficiently proved, and is definite in terms, and there has been performance by the plaintiff, * * * specific performance will be decreed. The evidence is always to be examined attentively and weighed carefully. * * * The large burden of responsibility for a correct result is upon the trial court." (Citing cases.) Brasch v. Reeves, 124 Minn. 114, 116, 144 N. W. 744, 745.

"The contract must be proved by clear, positive, and convincing evidence." Jannetta v. Jannetta, 205 Minn. 266, 269, 285 N. W. 619, 621. And upon plaintiff rested "the burden to show, by 'full and satisfactory proof of the fact,' the contract and 'its terms.'" Hauge v. Nordin, 197 Minn. 493, 495, 267 N. W. 432, 433. And we must always be mindful that "care should be taken not to attach promissory and contractual effect to what was at the time merely an expression of intention concerning future action." Carlson v. Krantz, 172 Minn. 242, 247, 214 N. W. 928, 930, 54 A. L. R. 545. Many more cases might well be cited, but we deem this unnecessary since there is no quarrel about the applicable rule.

■ Measuring the evidence as disclosed by the record by the foregoing yardstick, we think there can be no doubt that at most plaintiff's case furnished a fact issue for the trial court. It has assumed and discharged the "large burden of responsibility" (Brasch v. Reeves, *supra*) resting upon it, and upon this record it is not for us to interfere.

Judgment affirmed.