MURIEL F. McCARTY v. R. R. NELSON, ADMINISTRATOR OF ESTATE OF ALBIE C. SANSBURY, AND ANOTHER. RAY FRANKLIN BUSHAW v. SAME. MARVEL SANSBURY v. SAME.[1]

March 16, 1951.

No. 35,287.

---

[11]Webber v. Webber, 157 Minn. 422, 196 N. W. 646; Starks v. Starks, 220 Minn. 313, 19 N. W. (2d) 741; Baker v. Baker, 224 Minn. 117, 28 N. W. (2d) 164.

[1]Reported in 47 N. W. (2d) 595.

*H. G. Haugland* and *E. John Abdo,* for appellants.
*E. Luther Melin,* for respondents.

CHRISTIANSON, JUSTICE.

Appeals by defendants, consolidated for review by this court, from judgments for plaintiffs in three separate actions, which were consolidated for trial in the district court. Each of the cases involves an action for specific performance of an alleged oral contract to devise and bequeath real and personal property owned by Albie C. Sansbury, deceased, at the time of his death.

Albie C. Sansbury died intestate on April 28, 1948. At the time of his death he was 64 years of age and resided on a small farm near the Mississippi River at Eighty-first and Lyndale avenues north in the city of Minneapolis. On August 20, 1907, he married the plaintiffs' mother, who was then operating the Garfield Hotel in Minneapolis. She predeceased him on March 21, 1947. There was no issue of their marriage. Mr. Sansbury was about 24 years of age at the time of the marriage.

Plaintiffs are the children of Mrs. Sansbury by two former marriages. Ray Bushaw was born on August 6, 1892; Muriel McCarty about April 7, 1894; and Marvel Sansbury on April 30, 1904. At the time Mr. Sansbury married their mother, Ray was 15 years of age, Muriel about 13, and Marvel about 3. They were then living with their mother at the Garfield Hotel. Later, when their mother and Mr. Sansbury moved to various other locations, among which were "farming districts" in the city of Minneapolis, they all continued to live together until Muriel married in the fall of 1910, when she was 16 years of age. Thereafter she had a separate home of her own, except for a period of about two weeks in 1927 when she returned to Minnesota from Wisconsin, where she had been living, and stayed with the Sansburys. Ray married in 1915 and about a year later established his own home. Marvel lived with the Sansburys until 1921, when, at the age of 16, she was adjudged feeble-minded and committed to the state institution at Faribault. She returned to live with the Sansburys in 1927 and continued with them until her mother died in 1947. Thereafter, she stayed at the Hennepin County Home. Mr. Sansbury paid for her board at the home.

Defendant Margueriette H. DeKarlo is an adopted daughter of Mr. and Mrs. Sansbury. She was taken into the Sansbury home shortly after her birth, before her adoption, and lived continuously with them until she was about 21 years of age. She was legally adopted by Mr. and Mrs. Sansbury on October 27, 1923. She left Minneapolis in 1942 and was thereafter married. At the time of Mr. Sansbury's death she was residing in California. Upon being notified of his death, she came to Minneapolis to attend the funeral and took possession of his estate. In her petition filed with the probate court for administration of the estate, she named herself as Mr. Sansbury's daughter and his sole heir at law. Defendant R. R. Nelson was appointed special administrator of the estate on May 14, 1948, and on June 23, 1948, he was appointed general administrator thereof.

In their respective complaints, each of the plaintiffs alleged that immediately after the marriage of Mr. Sansbury to their mother on August 20, 1907, the plaintiffs and Albie C. Sansbury and Mrs. Sansbury, their mother, contracted orally by and between each other as follows:

That if plaintiffs "would live in the house and home of Albie C. Sansbury and his said wife, and live with them and give them their services as they should be directed until they had become of age or married, that in consideration thereof, at their death said Albie C. Sansbury and his wife would give and leave" to each of the plaintiffs "a full child's proportionate share, as if they had been born unto them, of all the property, both real and personal, which they own and which they might own at the time of their death."

Defendants by separate answers to plaintiffs' complaints denied the existence of such an agreement and maintained that plaintiffs were not entitled to any share of Albie C. Sansbury's estate.

At the beginning of the trial plaintiffs' actions were recognized as equity cases. However, upon the trial court's inquiry of counsel as to whether they had "talked about any issues for a jury," plaintiffs' attorney stated that plaintiffs would like to have submitted to a jury the question "whether or not there was an oral contract between the decedent, Sansbury, and the three [plaintiffs] to take them into his family as his children with reciprocal services of parent and child, and if so, then these children would inherit property as a child," and after some discussion between the attorneys and the court with respect thereto the court ordered a jury impaneled to determine "that one issue."

Considerable evidence was then submitted concerning plaintiffs and the Sansburys showing, among other things, that the plaintiffs referred to the Sansburys as "Ma and Pa" and "Dad," and that the Sansburys referred to plaintiffs as son and daughters; that a happy, congenial, and helpful family relationship existed between all of them; that, during the time plaintiffs lived with

the Sansburys, Ray raised a garden at Mr. Sansbury's direction, drove him to work in a horse and buggy, and assisted in looking after the horse, a cow, and tending chickens; that Muriel, until she moved away at the age of 16, helped around the house, took care of Marvel, and helped some in the garden, where they all "took turns"; that Marvel washed dishes, cleaned floors, and did other household work when she was at home; that both Ray and Muriel were extensively employed away from home; that Ray worked in a mattress factory, then studied and worked at the automobile trade, and later was employed by the Milwaukee road, and that all of his earnings "went into the home"; and that Muriel went to work when she was 14 years of age and continued to work until she became 16, when she married, and that she brought her earnings home.

The only evidence in any way tending to show the alleged oral contract between plaintiffs and their stepfather was that of plaintiffs' maternal aunt, a sister of their mother, Mrs. Leah Rempher, and one Carl Otto Frenzel.

Mrs. Rempher first related that her home was at Grand Forks, North Dakota; that she visited with her sister, plaintiffs' mother, then Mrs. Hierlmier, for about two days in 1905 while her sister was then living in St. Paul; that plaintiffs, who were then children, were living with her; that a Mr. Hart was there for dinner one night; that the first time Mrs. Rempher met Mr. Sansbury was on this visit; that before she met Mr. Sansbury her sister explained to her that Mr. Hart wanted to marry her and to take Ray, Muriel, and Marvel as his own children; that her sister wanted her to meet Mr. Sansbury, because she liked him better than Mr. Hart, and the two of them went out to Fort Snelling to meet Mr. Sansbury, who was then a first sergeant in the United States Army.

Mrs. Rempher then related that she again visited her sister in August 1907 shortly after her sister and Mr. Sansbury were married. They were then living at the Garfield Hotel in Minneapolis, and the children, the plaintiffs, were living with them. On this

visit, she, her sister, Mr. Sansbury, and the children had a conversation while all of them were seated around the family dinner table regarding "plans for the family, being recently married"; "they were talking about getting acreage somewhere. They wanted a farm and wanted a home away from that hotel. *It wasn't the place for children."* (Italics supplied.) During the course of the conversation, Mr. Sansbury "spoke up" and said "to Muriel and Ray and all of us," "If you kids do your part, why, I will do my best as a father to you children and go out on this place [farm]." Mrs. Rempher testified further that "He said he was taking these children and going to do the best by them that he could." When asked on direct examination, "Did Mr. Sansbury say that he would consider these children as his children?" she answered, "Well, he merely stated the fact that he was going to try to be the best kind of parent he could be under the circumstances." On redirect examination, she testified that Mr. Sansbury told her, "I have agreed to take these three children as my own children and treat them as a natural parent would."

Carl Otto Frenzel testified that in a conversation he had with Mr. Sansbury in 1938 Mr. Sansbury told him "he would take care of the children just like his own"; that "he didn't know just exactly what to do about * * * Marvel," "he said Marvel was a problem child like—well, not problem child, but a child that couldn't take care of her own self, in later years, and he had to make provisions for her, and he didn't know about the rest of them"; and that "He wasn't going to take it with him, but was going to provide for each of them when he passed away." Mr. Frenzel said that no will was mentioned.

After the close of the testimony, the court submitted the following special interrogatory to the jury. We quote from the court's charge to the jury:

"* * * I am submitting to you just one question in each case, and the question is this: Was there an agreement made on or about August 20th, 1907, between Albie C. Sansbury, on one

side, and his wife, Alice Ames Sansbury, and her child, Muriel Bushaw [McCarty], the plaintiff herein, on the other side, that thereafter the relationship of natural father and child should exist between Albie C. Sansbury and the child, Muriel Bushaw [McCarty]? There will be an answer of yes or no to that question.

"The same question is in each case, except, of course, the name of the promisee, the child, is different in each verdict."

The jury answered the interrogatory thus submitted in the affirmative in each case. Thereupon the court "confirmed and adopted" "the special findings of the jury," made them a part of its findings in each case, and based its finding No. XXII in each case thereon. Finding of fact No. XXII reads as follows:

"That Albie C. Sansbury, deceased, entered into and became bound by said agreement, which established the relation of natural parent and child between him and the plaintiff, *by which he was obligated to give and leave at his death to this plaintiff,* upon the performance by plaintiff of his part of said agreement, a one-quarter *(1/4) interest,* a child's proportionate interest, in all the property, real and personal, of which he might die seized and possessed." (Italics supplied.)

The trial court's other related findings of fact and its conclusions of law granting specific performance, awarding each plaintiff an undivided one-quarter interest in the assets of said estate and other relief, likewise were predicated upon the jury's special verdict in each case.

On appeal, defendants contend that the trial court's finding No. XXII, above quoted, and its other related findings, its conclusions of law therefrom and order for judgment for plaintiffs are not justified by the evidence and are contrary to law. At the oral argument, defendants' counsel conceded that the evidence was sufficient to support the special verdict of the jury in each case, *i. e.,* that Albie C. Sansbury agreed to consider and treat plaintiffs as his own children, but maintained that the trial court's

findings are not justified by the evidence and that the special verdict of the jury does not support the lower court's decision.

Plaintiffs, on the other hand, contend that the decision of the trial court in each case is justified by the evidence and that the judgments appealed from should be affirmed.

It is well settled in this state that a person may by oral contract bind himself to give his property to certain designated persons at his death, and that such contract may, under certain circumstances, be specifically enforced. See, 5 Dunnell, Dig. & Supp. § 8789a, and 6 *Id.* § 10207, and cases cited. The terms of the contract, however, must be so definite and certain as to leave no doubt as to its meaning. Kins v. Ginzky, 135 Minn. 327, 160 N. W. 868; 5 Dunnell, Dig. & Supp. § 8781. Moreover, the burden is upon plaintiff to prove the fact of the contract and its terms by clear, positive, and convincing evidence before specific performance may be granted. Carlson v. Carlson, 211 Minn. 297, 300 N. W. 900; Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619; Greenfield v. Peterson, 141 Minn. 475, 170 N. W. 696.

In the instant case, it appears that the only direct promise Mr. Sansbury ever made to plaintiffs was during the conversation around the family dinner table at the Garfield Hotel when Mrs. Rempher, Mrs. Sansbury, Mr. Sansbury, and the children were talking about getting "a farm and * * * a home away from that hotel," because "It wasn't the place for children," and Mr. Sansbury "spoke up" and said "to Muriel and Ray and all of us," "If you kids do your part, why, *I will do my best as a father to you children and go out on this place* [farm]." The record discloses that Mr. Sansbury kept his promise and did provide a home and small acreage in the "farming districts" then in the city of Minneapolis, and that plaintiffs in turn did their part by raising a garden, taking care of a horse, a cow, tending chickens, and doing other household duties.

All the other evidence offered by plaintiffs in support of the alleged contract consisted merely of statements made by Mr. Sansbury, not to plaintiffs but to Mrs. Rempher and Mr. Frenzel.

Mr. Sansbury told Mrs. Rempher that "he was taking these children and going to do the best by them that he could." He also said to Mrs. Rempher, "I have agreed to take these three children as my own children and treat them as a natural parent would." In 1938, Mr. Sansbury told Mr. Frenzel that "he would take care of the children just like his own" and that he "was going to provide for each of them when he passed away." However, there was no mention of a will. Viewing the testimony of Mrs. Rempher and Mr. Frenzel in its most favorable light for plaintiffs, it does not constitute clear, positive, and convincing evidence that Mr. Sansbury ever promised or agreed that upon his death he would give and leave to each of the plaintiffs a one-quarter interest in all the property, real and personal, of which he might die seized and possessed, as alleged by plaintiffs and found by the trial court. Furthermore, it does not prove that Mr. Sansbury ever promised or agreed to adopt plaintiffs[2] or that he promised or agreed to leave them anything upon his death. There was no offer or acceptance of such a contract. There was no promise or agreement to that effect. There was no promise or agreement on Mr. Sansbury's part that he would make any provision for plaintiffs by will or otherwise when he died. The most that can be said from the evidence in this respect is that Mr. Sansbury expressed plans for future action in which each of the plaintiffs might be considered favorably. However, proof of a mere expression of intention is not proof of a contract. Carlson v. Carlson, 211 Minn. 297, 300 N. W. 900; Hanefeld v. Fairbrother, 191 Minn. 547, 254 N. W. 821. Equity will not make a contract for the parties or supply any material stipulation thereof. 5 Dunnell, Dig. & Supp. § 8785; 49 Am. Jur., Specific Performance, § 22. Mere allegation without proof is not enough.

The special verdict of the jury, which was adopted by the trial court, merely established that Mr. Sansbury agreed that the rela-

---

[2]In re Estate of Firle, 197 Minn. 1, 265 N. W. 818; Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455. See, Odenbreit v. Utheim, 131 Minn. 56, 154 N. W. 741, L. R. A. 1916D, 421.

tionship of natural father and child should exist between himself and the plaintiffs. It established the fact that Mr. Sansbury promised and agreed to treat and consider the children as if they were his own. That is neither an agreement nor a promise that at his death he would give and leave them his property. Even a natural child has no assurance of a vested inheritance. He may be cut off without a cent. He is not the born or created promisee of property. Clearly, the expressed intention and agreement of Mr. Sansbury to treat plaintiffs as his own children was only a normal development following his marriage to their mother, and the understandable desire of a stepfather to get along harmoniously in the atmosphere which marriages of this kind frequently engender.

What the evidence shows that plaintiffs did, young as they were while living in the Sansbury household, was nothing more than normally would be expected of children under the same and similar circumstances. What they did they normally would be expected to do for their own mother while living in her home and what any stepchild would do for a stepfather who permitted such child to remain in his home and whom he promised to treat as his own child. There is nothing in what Mr. Sansbury said or what the plaintiffs did from which it can be inferred that a binding contractual arrangement such as that alleged by plaintiffs and found by the trial court was effected.

In our opinion, the evidence is insufficient to sustain the finding of the trial court that such an agreement was made. Accordingly, the judgments must be reversed.

Judgments reversed.