ERNEST ZUELCH v. HERBERT DROEGE,
REPRESENTATIVE OF ESTATE OF WILLIAM EGGERS,
AND ANOTHER.[1]

January 16, 1953.

No. 35,804.

---

[1]Reported in 56 N. W. (2d) 651.

*Everett L. Young* and *Robert G. Williamson,* for appellant.
*O. S. Vesta* and *Arnold W. Beneke,* for respondents.

LORING, CHIEF JUSTICE.

Action to compel specific performance of an alleged contract to devise or convey to plaintiff a farm near Green Isle in Sibley county of which William Eggers died seised. The action has been tried twice. Both trials resulted in findings in favor of defendants, and this is an appeal from the judgment in the second action. It is plaintiff's contention that certain undisputed evidence submitted at the trial *required* findings in his favor.

The complaint alleges an oral contract providing in substance that, if plaintiff remained with or near Eggers, the decedent, throughout his lifetime, assisted him in farming operations on the land involved, and looked after his welfare and happiness, decedent would devise and bequeath to plaintiff the farm and all machinery, equipment, and livestock thereon or would give it to plaintiff during decedent's lifetime in the event he should at any time discontinue operating the farm; and also alleges that plaintiff fully performed his part of the agreement throughout decedent's lifetime. Decedent died intestate on February 23, 1948, leaving as his sole heir-at-law his sister, Mary Beneke, one of the defendants herein.

The evidence with reference to the contract may be summarized as follows: Plaintiff's sister, Ida Wiest, testified that in the fall of 1919 she advised decedent, who was then her employer, of her intent to leave his employment and to take with her plaintiff, who had resided with decedent since his sixth year; that decedent then stated that "he couldn't bear to see him [plaintiff] go," that, if plaintiff were left with him, he would see that he "grew up to be a good Christian" and that "he'd become a good farmer," that he would regard him as his own son, and that when he (decedent) died he would see that everything he had went to plaintiff; and that she then left decedent's employ but that plaintiff, at decedent's request, remained with him and thereafter attended parochial school and church selected by decedent.

She further testified that in 1922, after plaintiff had completed his elementary education, he advised decedent in her presence of his intention to attend Concordia college in St. Paul in preparation for the ministry; that decedent then stated that "he didn't want a minister in the family, he wanted a farmer," that when he left the farm he "wanted to be sure when someone got on the farm he knew how to run it," and that "as long as Ernie was going to have the farm he didn't see why he should go to the ministry"; and that at decedent's request plaintiff gave up his plan of entering Concordia and remained on the farm with decedent.

Willmer Miller testified that in 1946 decedent told him that: "Ernest came here as a little boy and I always took care of him, and he was good to me, and as long as he was living he'd like to keep his place, and whenever he died that Ernest should have the place." Eldora Miller testified that decedent had told her in 1946 that "when he was no more, Ernest should have the place." Lillie Stockmann testified that in 1933 decedent told her that: "What I have when I go, that shall be Ernest's." Fred Thalmann testified that in 1922 decedent told him that: "Ernest wanted to leave him and go away" but that he (decedent) "begged him to stay. * * * that he [decedent] would consider him just like if he was his own child, and some day whatever he had would be his anyhow"; and

that again in 1946 decedent told the witness that: "I like to keep this place clear. I always promised this to Ernest Zuelch and that is what I am really staying for * * * he's just been like my own child, * * *."

Evidence submitted by defendant or adduced in cross-examination in some conflict with a substantial portion of the above is as follows: A. G. Kuhlman, cashier of the Hamburg State Bank, testified that in 1948 decedent told him "Ernest left me again" and "Since he left me this time, some day he will be sorry" and that decedent was then sick and angry because of plaintiff's departure. August T. Radtke, president of the bank, testified to a conversation with decedent in 1929 in which he said to decedent: "* * * Zuelch has left you, that is not so good," to which decedent replied: "No, some day Ernest will be sorry." Ed Oelfke testified that in 1946 decedent had told him that "Ernest wanted * * * that he [decedent] should have signed the farm over to him, and which he didn't like to do" and that since plaintiff "could have made it hard for him that he could leave the place some day."

Emma Beneke testified that in 1945 decedent stated to her that "You know, Anna and Ernest have left me again"; "Ernest wanted me to sign over the farm to him"; "I cannot sign over the farm to Ernest"; "that is the last time I have taken them back. They are not coming back." Alfred Beneke testified that in 1945 decedent said to him that: "Ernest, he was only in church about three times one of the last years, and if I tell him something about it, all the answer I get, 'Church ain't for me, I can't stand it there.'" He testified to a conversation with plaintiff after decedent's death in which plaintiff said that: "As long as there isn't no will, well, I can't claim anything, and Bill didn't want me to have anything"; and that "he didn't want to owe anybody anything, * * * he paid me for taking him to the hospital and the doctor."

Herbert Droege testified that in the fall of 1945 decedent told him that "Ernest is leaving again and I have to find some help" and that "Ernest wanted me to sign the farm over or something like that, and I says I can't do that. I'm afraid they'd probably throw

me out." Orlando Beneke testified that about two months before decedent's death decedent asked him if he and his mother, Mary Beneke, would not live with decedent and keep up the place because his health was failing and he was lonesome and wanted them to look after him.

Evidence as to plaintiff's actions in performance of the contract and his relationship to decedent thereunder is as follows: Plaintiff came to live with decedent in 1914, at which time he was six years of age, accompanying his sister, Ida Wiest, who was to be decedent's housekeeper, and lived there until December 1929. From 1925 until sometime in 1928 decedent paid him $15 per month as wages for his work on the farm; when he became 20 in 1928 this was raised to $20 per month and in 1929 to $35 per month. During December 1929 and January and February 1930 plaintiff left the farm to attend a barber college in Minneapolis but returned to the farm in 1930. In 1929 he married Anna Ische, who was then working for decedent on the farm, and he continued to work there and received wages at the rate of $35 per month until 1932. In 1932 with his wife he left decedent to operate a farm he had rented some nine or ten miles away. He returned to decedent's farm in 1933 and thereafter worked there on a share-crop basis with decedent until 1937. In 1937, because of an injury, he could not perform farm labor and moved to Norwood, where he engaged in light work, remaining there until 1942. During this interval he visited decedent each week and during one period helped decedent in the construction of a barn, for which he received no compensation. During plaintiff's many absences from the farm decedent was required to employ others to assist in farming operations. In 1942 plaintiff returned to decedent's farm and again operated it with decedent on a share-crop basis until 1946. In 1946 he left decedent and rented a farm nearby where he has remained since. In March 1946 decedent leased the farm to a tenant on a share-crop basis. Decedent became seriously ill in January 1948 and plaintiff thereupon took him to Glencoe hospital in Glencoe, where he died 25 days later. Decedent paid plaintiff for taking him on this trip and, while decedent was

in the hospital, plaintiff checked the accounts of the tenant then operating decedent's farm.

In its findings the court determined that there was evidence of an intent to leave the farm to plaintiff but no writing to such effect; that plaintiff had been paid for all his services on decedent's farm; that in any event plaintiff's conduct in remaining away from the farm for a number of years terminated and violated the terms of the contract; and that any sums due plaintiff for services rendered could be readily ascertained.

Plaintiff asserts that the evidence outlined is unimpeached and of such a positive nature that the court cannot disregard it and that thereunder he is entitled to findings that the contract was made and fully performed by him and to a decree of specific performance thereof.

■ The specific performance of an oral contract to give or devise is not a matter of right but rests in the sound discretion of the trial court. Determination of the question is based upon principles of equity and must be made in the light of all surrounding facts and circumstances. Schultz v. Brennan, 195 Minn. 301, 262 N. W. 877; Bredesen v. Nickolay, 147 Minn. 304, 180 N. W. 547; Baker v. Polydisky, 144 Minn. 72, 174 N. W. 526; 5 Dunnell, Dig. & Supp. § 8777; 49 Am. Jur., Specific Performance, § 8; 44 L.R.A. (N.S.) 733, notes I, V.[2] The contract must be definite as to its terms, and satisfactory proof thereof must be submitted by plaintiff before specific performance will be decreed. McCarty v. Nelson, 233 Minn. 362, 47 N. W. (2d) 595, certiorari denied, 342 U. S. 887, 72 S. Ct. 177, 96 L. ed. 665; Carlson v. Carlson, 211 Minn. 297, 300 N. W. 900; Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619; Schoonover v.

---

[2]In Kofka v. Rosicky, 41 Neb. 328, 334, 59 N. W. 788, 789, 25 L. R. A. 207, 43 A. S. R. 685, the trial court directed specific performance of a contract based on the consideration that decedents "receive the said child [their niece] as their own, * * * rear and educate her, and that she * * * should inherit and be left all the property * * *." In Walls' Appeal, 111 Pa. 460, 5 A. 220, 56 Am. R. 288, under similar facts, the trial court determined that the terms of the contract were too indefinite as to length of service and compensation to support an order for specific performance.

Schoonover, 86 Kan. 487, 121 P. 485, 38 L.R.A.(N.S.) 752; Green-field v. Peterson, 141 Minn. 475, 170 N. W. 696; Kins v. Ginzky, 135 Minn. 327, 160 N. W. 868; Ham v. Johnson, 55 Minn. 115, 56 N. W. 584; 5 Dunnell, Dig. & Supp. § 8781. While ordinarily the value of intimate companionship common to members of a family living together cannot be measured in money, the general rule ceases to be applicable when the recipient thereof is not otherwise incapacitated and receives no special care or services. Happel v. Happel, 184 Minn. 377, 238 N. W. 783; Simonson v. Moseley, 183 Minn. 525, 237 N. W. 413.

To compel specific performance of an oral contract of this kind, there must be full performance of the conditions imposed upon the party seeking such a decree. Jannetta v. Jannetta, *supra;* Morrow v. Porter, 161 Minn. 396, 202 N. W. 53; Brasch v. Reeves, 124 Minn. 114, 144 N. W. 744; Svanburg v. Fosseen, 75 Minn. 350, 78 N. W. 4, 43 L. R. A. 427; Schmidt v. Barr, 333 Ill. 494, 165 N. E. 131, 65 A. L. R. 1; 49 Am. Jur., Specific Performance, § 40. In determining whether there has been such performance, all surrounding circumstances must be considered, and evidence of conduct evincing the rescission or abandonment of the contract is material in determining this question. Jones v. Dove, 382 Ill. 445, 47 N. E. (2d) 447; Higbie v. Chase, 306 Mich. 577, 11 N. W. (2d) 248.

Keeping these principles in mind, we are of the opinion that there is sufficient evidence to support the trial court's determination that, if a contract existed here, plaintiff failed to establish his performance of the conditions imposed upon him therein. The terms of the alleged contract are dependent almost entirely upon the testimony submitted by Ida Wiest, sister of plaintiff. Giving her testimony its full value still leaves much doubt as to the contract's terms and, in particular, as to plaintiff's obligations thereunder. She testified that in 1919 decedent promised that if plaintiff were left with him "he'd become a good farmer" and at his death would receive the farm and that in 1922 decedent stated that "he didn't want a minister in the family, he wanted a farmer" and

he "wanted to be sure when someone got on the farm he knew how to run it."

The only fair inference that can be drawn from this testimony is that decedent's promises were based upon the condition that plaintiff remain with him and operate the farm throughout decedent's lifetime. This is corroborated by decedent's frequent statements that plaintiff would regret leaving the farm. It is corroborated further by plaintiff's own statements testified to by Alfred Beneke that "As long as there isn't no will, well, I [plaintiff] can't claim anything"; that decedent "didn't want me to have anything"; and that decedent didn't want to owe anybody anything and had even paid him (plaintiff) for taking decedent to the hospital.

The evidence of plaintiff's failure to perform the conditions and obligations thus imposed upon him by virtue of the contract amply sustains the trial court's finding on this issue. In 1929, after he reached the age of 21, he left to attend a barber college in Minneapolis. In 1932 he again left to operate a farm which he had rented some nine or ten miles away. When he returned, he entered into a share-crop contract with decedent, the same type of contract either of the parties might have made with a stranger. This arrangement continued until 1937 when plaintiff left again to engage in light work at Norwood. He returned in 1942 and until 1946 worked the farm with decedent on a share-crop basis. He left permanently in 1946 to operate a nearby farm on his own account and was there at the time of decedent's death.

There being evidence to sustain the trial court's finding, the judgment appealed from must be affirmed.

Affirmed.

Mr. Justice Roger L. Dell, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.