# FREBERT L. EHMKE v. HOWARD HILL AND OTHERS.[1]

February 15, 1952.

No. 35,652.

[1]Reported in 51 N. W. (2d) 811.

*Bang & Nierengarten,* for appellants.
*Baudler & Baudler,* for respondent.

MATSON, JUSTICE.

Appeal by defendants other than Margrate and John Ehmke from an order denying defendants' motion for a new trial in an action for specific performance of an oral contract to convey land.

Decedent, Theodore W. F. Ehmke, plaintiff's uncle, died intestate on February 6, 1950, as the record owner of the 120-acre farm involved herein. Defendant Howard Hill is the administrator of his estate. The other defendants are decedent's only heirs at law. Plaintiff—born in 1910—is the illegitimate son of Theodore's sister Johanna, who predeceased him.

Decedent never married and was childless. Plaintiff's mother kept house for him. Until 1915, or for the first five years of his life, plaintiff and his mother lived with decedent on rented farms. Thereafter the three of them moved to a 162-acre farm which had been owned by decedent's father and was known as the old home place. Defendants John and Margrate Ehmke also lived thereon. After quitting school in 1927 at the age of 17 years, plaintiff spent the next five and one-half years, or until 1933, on the old home farm working as a farm hand for his uncle, the decedent. He received no compensation for this work. In the winter of 1933, plaintiff decided to give up farm work and acquire a repair shop and garage in the village of Waltham which could be bought for $3,000. Decedent, as compensation for plaintiff's five and one-half years of labor, agreed to buy the repair and garage business for him. Upon further investigation, plaintiff concluded that it was then inadvisable to enter upon this new venture. As a result, he still stood uncompensated for his work.

In lieu of the garage and repair-shop business, decedent suggested that plaintiff take possession of a 120-acre farm which the former

had acquired through a mortgage foreclosure. Through many years of rental exploitation and neglect, the soil of this farm had become unproductive and was so littered with rocks as to make cultivation difficult. Its few buildings and fences were dilapidated and unfit for normal use. By reason of its run-down condition, the farm was difficult to rent. In the late winter of 1933, plaintiff, pursuant to an oral contract with decedent, took possession of the farm. It was orally agreed that he should operate the farm during decedent's lifetime, and that during such period he should, in addition, maintain the close personal relationship which had theretofore existed between him and decedent and assist the latter as before with his business affairs and personal errands. In consideration thereof, decedent agreed that upon his death the farm should be left to plaintiff. As part of this arrangement—which is corroborated by the conduct of the parties—it was agreed that in the operation of the farm the parties should each supply one-half the seed and the commercial fertilizer and each should receive one-half the grain raised. Plaintiff was to pay cash rent for the fodder, hay, and pasture land.

Under the above agreement, plaintiff occupied and operated the farm until his uncle died in 1950. In the course of his occupancy, plaintiff converted the place from an unproductive acreage into a profitable farm that was above the average in Mower county. He cleared the land of rocks and built up the soil by fertilization and by the plowing under of certain crops. With certain contributions of financial and physical aid from decedent, he constructed new buildings, moved, altered, and repaired old buildings, and otherwise gave freely of his time and assets in rehabilitating the farm.

Over and beyond his work on the 120 acres, plaintiff gave freely of his personal life and time to decedent as if he were the latter's son. He continued the close personal relationship and mutual affection which had begun with his boyhood days and which ripened with the years until his uncle, when at last faced with the imminence of death as he entered the hospital, gave instructions that of all his relations and friends plaintiff alone should be notified

if he took a turn for the worse. When a blood transfusion was necessary, plaintiff was on hand to supply the need. The final hour was preceded by many years of devoted personal service. Although plaintiff lived with his wife on the 120-acre farm and decedent stayed on the old home place, the two spent much of their time in close association. When the uncle desired to visit neighboring towns for business or otherwise, plaintiff accompanied him and drove the car. On visitations to friends and relatives, as well as on fishing trips and in going to church, it was plaintiff who did the driving and provided decedent with companionship. He wrote decedent's letters. If decedent's car or decedent's farm machinery on the old home place needed repairs, it was plaintiff who gave up his own activities to do the work. Although decedent from time to time gave plaintiff some assistance on the 120-acre farm, it should be noted that this was more than offset by plaintiff's labor on the old home place, where he helped shock grain, put up hay, repair and build fences, and do the plowing with his tractor. In fact, when decedent in the early spring of 1936 broke his shoulder, plaintiff put in the crop for decedent on the latter's 80-acre portion of the old home place, and at his own cost furnished a farm hand. All this latter work he furnished and performed without compensation. In fact, plaintiff gave so much of his personal time to decedent that he sacrificed to a material degree a normal family life, with the result that his wife found herself neglected. Furthermore, plaintiff on two different occasions sacrificed the chance to better his lot in life when, by reason of his obligations to decedent under the oral contract, he gave up the opportunity to make advantageous purchases of nearby farms.

Decedent died without fulfilling his part of the agreement by devising or otherwise conveying the 120-acre farm to plaintiff. Plaintiff is not one of his heirs at law.

We have, as any court of review must, stated the facts in the light most favorable to the trial court's findings. As usual, there was a sharp conflict in the evidence on many factual phases. Upon review, however, the question is not whether the evidence would

reasonably sustain findings contrary to those made by the trial court, *but whether its findings as made* are reasonably sustained in the light of the evidence as a whole. Here, the existence of the oral contract was testified to in a clear, positive, and convincing manner by decedent's sister, Margrate Ehmke, one of the defendants, who, although a party to the action and interested in the event thereof, was permitted to testify as to a conversation which was held in her presence between decedent and plaintiff in 1933, when plaintiff had decided not to buy the garage and repair shop at Waltham. She testified that decedent then said that if plaintiff stayed with him, tended to and helped him, and built up the 120-acre farm it was to be his when decedent died. She also testified as to other corroborative conversations. There is also corroborative testimony by another defendant, decedent's brother, John Ehmke. A wholly disinterested party, Leonard Fossum, testified that decedent had told him in specific terms that he had made an *agreement* that plaintiff was to have the farm upon his death. This testimony is further corroborated by the surrounding circumstances and the actual conduct of the parties. It follows that the trial court's findings are not merely sustained, but the oral contract involved is established by clear, positive, and convincing evidence which leaves no uncertainty as to its terms. See, McCarty v. Nelson, 233 Minn. 362, 47 N. W. (2d) 595.

In holding that the findings are sustained, we have not overlooked the fact that they are based to a very material degree on testimony given by two of the defendants, Margrate and John Ehmke. Appellants contend that under M.S.A. 595.04 their testimony was incompetent and inadmissible as a conversation with a deceased person. In addition to the question of the competency of their testimony, an issue has been raised as to whether there was sufficient part performance with unequivocal reference to the oral contract and of a nature which entitles plaintiff to specific performance.

■ Over appellants' specific objection that she was incompetent under § 595.04 to give testimony concerning any conversation with

decedent, Margrate Ehmke, one of the parties defendant to the action and a sister of decedent, who as one of his heirs at law would inherit a share in the 120-acre farm in the event plaintiff was unsuccessful in proving his case, was permitted to testify concerning a conversation between plaintiff and decedent. Clearly, her testimony, on the specific issue to which it related, was directly adverse to her own personal interest as a party to the action and as decedent's heir at law. The trial court admitted her testimony on the theory that § 595.04 has no application to a party to the action, or a person interested in the event thereof, who testifies adversely to his own interest. What has been said as to the testimony of Margrate also applies to the testimony of John Ehmke.

Section 595.04, insofar as here concerned, provides:

"It shall not be competent for any party to an action, or any person interested in the event thereof, to give evidence therein of or concerning any conversation with, * * * a deceased * * * person relative to any matter at issue between the parties, * * *."

Contrary to the face of the statute, it disqualifies from testifying only a party who has been *properly*[2] joined in the action and who, *with respect to the specific issue to which the testimony relates,*[3] has some pecuniary, legal, certain, and immediate *interest*[4] in the event of the cause itself. Subject to the above limitations as to the possession of some certain and immediate interest in the event of the cause itself with respect to the specific issue to which the testimony relates, the statutory disqualification also applies to a person who is not a party to the action.[5]

[2]Towle v. Sherer, 70 Minn. 312, 73 N. W. 180; Exsted v. Exsted, 202 Minn. 521, 279 N. W. 554, 117 A. L. R. 599.

[3]Bowers v. Schuler, 54 Minn. 99, 55 N. W. 817; Geraghty v. Kilroy, 103 Minn. 286, 114 N. W. 838; Keough v. St. Paul Milk Co. 205 Minn. 96, 285 N. W. 809.

[4]Geraghty v. Kilroy, 103 Minn. 286, 114 N. W. 838; Exsted v. Exsted, 202 Minn. 521, 279 N. W. 554, 117 A. L. R. 599.

[5]Perine v. Grand Lodge, 48 Minn. 82, 50 N. W. 1022; Madson v. Madson, 69 Minn. 37, 71 N. W. 824; Towle v. Sherer, 70 Minn. 312, 73 N. W. 180;

Unless § 595.04 has no application to a person *who testifies adversely to her own interest,* Margrate Ehmke's testimony as a proper party to the action was inadmissible as falling·clearly within the above limitations. Section 595.04 is to be given a fair and reasonable construction *to accomplish its purpose*—to make it work to the full extent intended by the legislature.[6] Was it the purpose of the legislature to disqualify any person from testifying whose testimony is adverse to his own interest? In answering this question, we must examine the rule at common law which disqualified witnesses as incompetent by reason of *interest* and the subsequent abolition of that rule, with the sole exception preserved in the dead man's statute.

"a. *Disqualification Because of Interest.*—It was long a rule that a person *interested in the outcome of the litigation* was incompetent to testify, and even in this modern age the rule exists in the case of the dead man's statutes which generally exclude one *interested* in the litigation from testifying as to communications or transactions with deceased persons. The same reasons which have abolished the disqualification of *parties in interest* in actions inter vivos should apply in actions against the estate of deceased persons. Yet we recognize this distinction apparently upon the theory that if a party gets a good chance without much chance of discovery *he will fabricate, falsify, and perjure to promote his interest.* Death of the adverse party is deemed to create this chance, so that the law, in order to protect dead men's estates from false claims, sacrifices the just claims of the living by the

Pitzl v. Winter, 96 Minn. 499, 105 N. W. 673, 5 L.R.A.(N.S.) 1009; Nelson v. Olson, 108 Minn. 109, 121 N. W. 609; Drager v. Seegert, 138 Minn. 6, 163 N. W. 756; Larson v. Dahlstrom, 214 Minn. 304, 8 N. W. (2d) 48, 146 A. L. R. 245; Cocker v. Cocker, 215 Minn. 565, 10 N. W. (2d) 734; In re Estate of Eklund, 233 Minn. 519, 47 N. W. (2d) 422.

6Pomerenke v. Farmers L. Ins. Co. 228 Minn. 256, 36 N. W. (2d) 703, and cases cited therein; In re Estate of Eklund, 233 Minn. 519, 47 N. W. (2d) 422.

iron clad prohibition against an *interested* person giving testimony." (Italics supplied.) 18 Minn. L. Rev. 516.

"In almost every jurisdiction in the United States, by [dead man's] statutes enacted in connection with or shortly after the statute removing the general disqualification *by interest,* an exception was carved out of the old disqualification and was allowed to perpetuate within a limited scope the principle of the discarded rule." (Italics supplied.) 2 Wigmore, Evidence (3 ed.) § 578.

It is to be noted that the rule at common law which disqualified a witness as incompetent was bottomed on his *interest* in the outcome of the litigation. When dead man's statutes were enacted as an exception to the complete abolition of the common-law rule, it is strikingly clear that the purpose of the lawmaking bodies was to prevent a witness—who stood little chance of discovery—from fabricating, falsifying, and perjuring himself *to promote his own interest.* Without question, the legislative purpose was *only* to seal the lips of those whose *personal and immediate interest* in the issue litigated might tempt them to give false testimony *of a self-serving nature.* Where a witness testifies adversely to his own interest, all motive for a self-serving falsification is absent, and no statutory purpose is served by excluding his testimony. It follows that, pursuant to a fair and reasonable construction of the dead man's statute (§ 595.04) to accomplish its entire purpose as intended by the legislature, any person, whether he be a party to the action or not, and even though he has some pecuniary, legal, certain, and immediate interest in the event of the action with respect to the issue to which his testimony relates, is competent to testify *when his testimony is adverse to his own interest.* See, § 645.16 (1, 2, 3, 4). This conclusion is in accord with the dicta of Justice Mitchell in Bowers v. Schuler, 54 Minn. 99, 55 N. W. 817.[7]

[7]See, article by Mason Ladd in 18 Minn. L. Rev. 506, 516-517; 19 Iowa L. Rev. 521; 26 Iowa L. Rev. 207; A. L. I., Model Code of Evidence, pp. 339-340; 2 Wigmore, Evidence (3 ed.) § 578; 7 Wigmore, Evidence (3 ed.) § 2065.

Our refusal to extend the dead man's statute beyond the purpose for which it was enacted brings to the front appellants' fear that the statute will henceforth be circumvented by collusion. If this were true, the sole remedy, of course, would lie with the legislature. Their fear, however, is groundless. There is no greater likelihood of collusion on the part of a witness testifying against his own interest than on the part of one who has no interest whatever in the action. In either case, the test of cross-examination and the other safeguards for truth are a sufficient guaranty against the likelihood of erroneous decision. 2 Wigmore, Evidence (3 ed.) § 578. In the instant case, ardent and effective advocacy on both sides safeguarded the truth and was of material aid to the trial court in arriving at a sound interpretation of the evidence.

■ Appellants, in reliance upon Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. (2d) 362, 166 A.L.R. 435, assert that the services performed by plaintiff were not unequivocally referable to the vendor-vendee or testator-devisee relationship under the oral contract so as to avoid the statute of frauds and justify the granting of specific performance. In the Shaughnessy case, we held that the taking of possession by the purchaser, acting under an oral contract for the transfer of an interest in land, coupled with the making of part payment of the purchase price, in reliance upon and with unequivocal reference to the vendor-vendee relationship, *without proof of irreparable injury through fraud,* was sufficient to avoid the statute. By that decision, we did not adopt the unequivocal reference theory as the sole manner in which an oral contract may be removed from the statute of frauds. We simply held *that proof of irreparable injury through fraud* is unnecessary *where there is both a taking of possession and the making of part payment with unequivocal reference to the oral contract* of purchase. In other words, that decision does not preclude resort to the fraud theory of part performance. It follows that, since the Shaughnessy decision, an oral contract for the transfer of an interest in land, whether by conveyance or by will, may be removed from the purview of the statute of frauds on either the unequivocal ref-

erence theory or on the fraud theory of part performance. See, 31 Minn. L. Rev. 497-499; 21 Minn. L. Rev. 224; cf. Brown v. Hoag, 35 Minn. 373, 29 N.W. 135 and Happel v. Happel, 184 Minn. 377, 238 N. W. 783. It is here unnecessary to determine whether plaintiff's services were performed with unequivocal reference to the testator-devisee relationship, in that in any event the oral contract is subject to specific performance on the fraud theory of part performance. See, Happel v. Happel, *supra*.

To warrant specific performance of an oral contract to give real property by will, the contract (a) must be established by clear, positive, and convincing evidence[8]; (b) it must have been made for an adequate consideration and upon terms which are otherwise fair and reasonable; (c) it must have been induced without sharp practice, misrepresentation, or mistake; (d) its enforcement must not cause unreasonable or disproportionate hardship or loss to the defendants or to third persons; and (e) it must have been performed in such a manner and by the rendering of services of such a nature or under such circumstances that the beneficiary cannot be properly compensated in damages.[9] As already noted, the contract has been established by clear, positive, and convincing evidence. It is reasonable and fair in both its terms and in its inception, and its enforcement will result in no *disproportionate* hardship or loss to any defendant or other person. Do we have, however, performance of a nature that will justify specific performance? Were plaintiff's services of so peculiar a character and rendered under such circumstances that he cannot be compensated in money? We believe they were. We need not repeat the facts. It is only necessary to point out that plaintiff, over and beyond the services which might be reasonably ascribed to any mere landlord-tenant relation, performed services for decedent which were of a peculiarly personal nature and value, and that to perform them he found it reasonably necessary to neglect his normal role as a husband and companion of his wife and to

[8]McCarty v. Nelson, 233 Minn. 362, 47 N. W. (2d) 595.
[9]Matheson v. Gullickson, 222 Minn. 369, 24 N. W. (2d) 704.

sacrifice opportunities to better his lot by foregoing the advantageous purchase of other property. In the usual case, the peculiarly personal services which are not subject to pecuniary measure and which therefore warrant specific performance involve the assumption of a close domestic relation as a member of the promisor's family and the sharing with him of a common household. What is usual is not the test. In doing equity, a common factual denominator for the reconciliation of all cases is out of the question. Similar facts produce and reflect different equitable considerations according to the varied settings in which they are found. Matheson v. Gullickson, 222 Minn. 369, 374, 24 N. W. (2d) 704, 707. Although plaintiff and decedent occupied different households in operating the old home place and the 120-acre farm, there was at all times between them an active tie of companionship, affection, and mutual regard characteristic of a father-son relationship. Whether it was for decedent's business or pleasure, or to give him aid and comfort in time of illness, plaintiff responded throughout the years with constant filial devotion. Although there are present certain elements for which adequate consideration in money might be made, we do have substantial sacrifices and extensive services of a peculiarly personal nature which cannot be measured in money. Taking the evidentiary picture as a whole, specific performance is warranted, and the order of the trial court must be affirmed.

Affirmed.