STANDARD CONSTRUCTION COMPANY, INC., v. NATIONAL TEA COMPANY AND OTHERS.[1]

December 11, 1953.

No. 35,845.

---

[1]Reported in 62 N. W. (2d) 201.

Best, Flanagan, Rogers, Lewis & Simonet, for appellants.
Bauers & Carlson, for respondent.

FRANK T. GALLAGHER, JUSTICE.

This was an action by Standard Construction Company, Inc., referred to hereinafter as Standard, to foreclose a mechanic's lien for $11,268.47, in which defendant National Tea Company, referred to hereinafter as National, counterclaimed for $180,333.26 allegedly paid under protest in excess of the amount due plaintiff. The case was tried before the court without a jury. Judgment was granted for plaintiff in the amount of $10,776.33, plus $10,000 attorneys' fees and $10 costs, and National's counterclaim was denied. Defendants National and Northwestern Mutual Life Insurance Company of Milwaukee, Wisconsin, appealed from an order denying their alternative motion for amended findings of fact and conclusions of law or for a new trial.

On March 23, 1946, Standard signed a contract to build a huge combination garage, warehouse, bakery, and office building for National in Hopkins, Minnesota. Northwestern Mutual Life Insur-

ance Company purchased the building after its completion and leased it to National, but for the purposes of this opinion we will consider the action as one between Standard and National. Because of the circumstances in which National found itself in 1946, extreme haste characterized the project from its inception to the completion of the work. The federal government had ordered that no commercial construction be continued after March 25, 1946, unless an integral part of the structure was in existence on that date. There was testimony that it was imperative to National that construction go forward because at that time its whole development in this area depended upon this expansion of its base of operations. In any event, in an apparent effort to comply with government regulations, a few yards of concrete footing were poured on March 25, 1946, although never incorporated into the structure which was built. According to the record, National's desire for haste continued throughout the course of construction because it was being subjected to high demurrage costs as the result of the inadequacy of its old warehouse and because it wanted to vacate and sell the old warehouse while the market was still favorable and before threatened major repairs became necessary.

The contract provided that Standard procure all necessary materials and construct the building according to the plans then in existence for a fixed percentage of the total cost, which was not to exceed $1,245,000. No completion date was specified. It seems agreed that the plans and specifications then available were at best a hazy approximation of the building which resulted. The original plans were produced in less than a week, although there was testimony that from six to twelve months are usually required to draw complete plans for a building of this type. Standard's estimator was given only 24 hours in which to prepare the bid based on these plans.

Plan changes, confusion, and delays accompanied almost every step of the construction process. Altogether 146 change orders were presented. Their purpose apparently was to permit adjustment of the maximum guaranteed price in order to allow for the cost of departures from or elaborations of the plans on which the original bid was based. Only four of these change orders are disputed on this

appeal. The conceded cost of the building was more than half a million dollars over the original bid. After the bid was accepted, the proposed location and elevation of the building was changed. Later, it was decided to construct the building of reinforced concrete rather than structural steel; the size of the structure was increased by about one-fourth; and numerous other significant changes were made. Although the trial court held that the contract was still in force, it observed in its memorandum that the facts of the case provided considerable support for the contention that the conduct of the parties had resulted in an abandonment of the original contract or a waiver of the ceiling price provision.

As of the date of trial National conceded the propriety of change orders resulting in an increase over the original bid of $615,171.57, making a total cost of $1,860,171.57. The trial court found that the original price, plus allowable change orders, resulted in a net price of $2,058,011.17, of which National had already paid all except $10,776.33. It granted judgment in that amount with interest at six percent from the date of completion of the building, plus $10,000 attorneys' fees and $10 costs. On this appeal, National contends that the allowance of four of these change orders was not supported by the evidence and was contrary to law.

■ In allowing change order No. 107 the trial court found that the guaranteed maximum price of the building should be increased by $71,815.66 to cover the cost of compaction not contemplated when the original contract was signed. Compaction is the process which was used for compressing earth that had been hauled in to serve as support for the concrete floor of the warehouse. Its purpose was to increase the density of the freshly hauled earth to approximately that of natural soil, thus reducing the danger that the structure supported by the fresh fill would be damaged by settling. Most of the compaction on this project involved spreading of earth and clay in an eight-inch layer which was then sprinkled with water and rolled with sheep's-foot rollers until the proper density of soil resulted. The process was then repeated with successive eight-inch layers of fill until the proper elevation was reached. Part of the

floor of the building rested on fill which had been hauled and compacted until it reached a depth of over 17 feet. Where there was insufficient room for operation of the cumbersome machinery used in this type of compaction, the fill was hand compacted. This involved shoveling the earth into place and compressing it with vibrators which were similar in operation to compressed-air hammers. Part of the compacting was done by means of a third process which involved saturating the fresh fill with water, thus producing a concentration of the particles of earth after the water had drained away.

National accepts the finding of the trial court that Standard performed 44,454 cubic yards of machine compaction and 3,699 cubic yards of hand compaction. It contends, however, that the cost of compaction was or should have been included in Standard's original bid and that, therefore, no addition to the guaranteed maximum price is justified. National further contends that, if any price increase was properly allowed, the cost per cubic yard used in calculating the increase was excessive. The findings of the trial court must be judged by the familiar rule which requires that they be upheld if reasonably supported by the evidence considered as a whole. Knutson v. Lasher, 219 Minn. 594, 18 N. W. (2d) 688; Meiners v. Kennedy, 221 Minn. 6, 20 N. W. (2d) 539; Ehmke v. Hill, 236 Minn. 60, 51 N. W. (2d) 811; 1 Dunnell, Dig. (3 ed.) § 411.

Whether Standard should have allowed for the cost of compaction when it made its bid depends in part on the meaning of the original plans and specifications. With reference to the preparation of the earth beneath the building they provided that the contractor "prepare for paving where shown." Since the technical significance of this phrase is not apparent on its face, opinions of witnesses qualified as experts in the construction trade properly were received. St. Paul & Minneapolis Trust Co. v. Harrison, 64 Minn. 300, 66 N. W. 980. Theodore A. Hoffmeyer, Standard's superintendent of construction on the National job, testified that the original plans called for no compaction. Substantially similar testimony was given by Paul Andersen of the Department of Civil Engineering of the University of Minnesota and by Wesley E. King, president of a St. Paul

architectural firm, both apparently disinterested witnesses. National urges the proposition that an experienced contractor should have realized that fresh fill would require compaction where it served to support the concrete floor of the building. This argument is opposed by credible testimony to the effect that the original plans may be interpreted as indicating concrete piles rather than fresh fill as support for the building. Standard also offered testimony indicating that, although it anticipated the necessity for some compressing of the fresh fill, a process much less expensive than that used was contemplated. The evidence reviewed not only reasonably supports, but offers little to oppose, the trial court's finding that compaction as it was actually done was not contemplated when the original contract was signed.

The trial court found that 44,454 cubic yards of machine compaction were performed at a cost of $1.50 per cubic yard and that 3,699 cubic yards of hand compacting were performed at a cost of $4 per cubic yard. The resulting total was adjusted for overhead and profit and reduced by the amount included for earth processing in the original bid to arrive at a net total of $71,815.66. In support of this, Standard offered the testimony of four witnesses who were experienced in various phases of the construction business and were qualified to give opinions on the reasonable cost of compaction. Three of these witnesses were disinterested parties. In summary, their estimates of the cost of hand compaction ranged from $4 to $7.50 per cubic yard and their estimates of the price of machine compaction ranged from $2.50 to $3 per cubic yard.

National offered no expert testimony on this issue. It did offer the testimony of Edwin E. Madsen, a certified public accountant, who submitted in evidence an audit of the cost records of Standard which he claimed showed that the whole compaction process had actually cost Standard only about 31 cents per cubic yard. To offset this, Standard offered the testimony of several members of its staff in an effort to demonstrate the unreliability of Madsen's cost audit. They testified that it was impossible to determine the actual cost of the compaction which was done since National had expressly re-

fused to permit the hiring of the additional personnel required to maintain a cost accounting system and that adequate records were therefore not kept. Although these witnesses produced by Standard testified as to certain omissions made by Madsen in connection with his method of figuring the costs, they still were unable to demonstrate errors of sufficient magnitude to conclusively explain the difference between such costs as testified to by Madsen and those later determined by the court. However, it appears from the record that Madsen was a somewhat evasive witness, whose manner on the stand may have made an adverse impression on the court as evidenced by certain admonitions by the court to the witness with reference to "sparring" or trying "to act as both attorney and witness." Under the circumstances here the trial court was in a better position to observe all the witnesses in connection with the fact questions before it than we are on appeal, and we are not prepared to hold that its decision in the light of the evidence was unreasonable. It is of course settled that findings of valuation will not be disturbed if within the limits described by the evidence, even though they do not exactly adopt the testimony of any one witness. Lacey v. D. M. & I. R. Ry. Co. 236 Minn. 104, 51 N. W. (2d) 831, and cases cited therein.

With respect to the determination of the compensation to which the contractor is entitled for "extras," the contract provides that, if work is performed which involves costs not included in the original contract, the contractor must "keep and present in such form as the Architect may direct, a correct account of the cost, together with vouchers." However, it does not appear that the architect ever prescribed the form in which accounts of costs were to be kept and presented. Further, Sidney Hanson, Standard's estimator, testified that many change orders had been based on estimates of cost rather than detailed cost records. These change orders apparently had been accepted and approved by National without protest. As indicated earlier, there was also testimony that National had refused to authorize the hiring of the additional personnel necessary to maintain a cost accounting system. Thus it appears that with the assent

of both parties a practice was established which was inconsistent with the quoted provision of the contract, and a waiver of the right to demand compliance with that provision resulted. Meyer v. Berlandi, 53 Minn. 59, 54 N. W. 937; Walberg v. Jacobson, 143 Minn. 210, 173 N. W. 409; Evensta v. St. Olaf College, 173 Minn. 360, 217 N. W. 348.

A more difficult question is raised by National's contention that, since the contract required it to pay the "actual cost" of construction plus a percentage thereof as the contractor's fee, opinion evidence as to the *reasonable cost* of compaction was improperly received.

It was established in Kempf v. Ranger, 132 Minn. 64, 155 N. W. 1059, that if the question of cost is relevant it may be proved by expert testimony. That case was an action for fraudulent misrepresentation in the sale of a building. Plaintiff alleged that defendant had represented the original cost of the building to have been $9,500 and offered witnesses expert in construction to prove that it was much less. The trial court's rejection of this evidence was held error. Upon appeal this court said (132 Minn. 66, 155 N. W. 1060):

"* * * Defendant contends plaintiff should have produced the original builder or some one who had personal knowledge of the first cost. Such evidence would naturally be the most direct and satisfactory, but it is matter of common knowledge that the cost of a building may be estimated with reasonable certainty. This is all that is required."

Although the methods of cost determination necessitated here do not commend themselves as good business practices, they are not so unreliable as to preclude their use as a reasonable basis for the trial court's findings under the facts and circumstances of this somewhat unusual situation.

■ Change orders Nos. 108, 109, and 110 may conveniently be considered together. No. 108 was presented to recover the cost of bonus payments for overtime work which was resorted to in an effort to speed construction. It was allowed by the trial court in

the amount of $23,772.42. No. 109 was allowed as an adjustment of $15,246.59 to cover the increased cost of equipment rental due to the extended period of construction. Change order No. 110 involves the added expense which resulted from pouring concrete during the winter when the ingredients had to be heated and other precautions to prevent freezing were required. It was allowed in the amount of $40,860.59. The amounts of these adjustments are not disputed.

National urges, however, that Standard should have anticipated the probability of delays and the resultant added expenses when it made its bid and thus cannot now seek to be reimbursed for the added cost. As the trial court indicates, the responsibility for these delays is difficult to allocate. Quoting from its memorandum, which was made a part of its order, the trial court said in part:

"* * * The delays were perhaps the fault of no one, but due to the inherent nature of the undertaking. There were delays due to changes in materials. There were delays due to negotiations with reference to drainage and sewer connections, as well as water supply. These delays led to delays in determining elevation. None of these should be or could be, in the opinion of the Court, chargeable to the plaintiff, and could not reasonably have been contemplated by any contractor entering into a contract."

A review of the record satisfies us that there is substantial evidence in support of the court's position. Upon an appeal involving the determination of a question of fact by a trial court it is not the duty of the appellate court to review and discuss the evidence so as to demonstrate the correctness of the decision of the trial court. Anderson v. Farwell, Ozmun, Kirk & Co. 217 Minn. 110, 14 N. W. (2d) 311.

As stated in Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 12, 31 N. W. (2d) 920, 926, quoting from 6 Williston, Contracts (Rev. ed.) § 1931:

"* * * A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform. *The important question is whether an unanticipated circumstance has made per-*

*formance of the promise vitally different from what should reason-
ably have been within the contemplation of both parties when they
entered into the contract. If so, the risk should not fairly be thrown
upon the promisor."*

The fact that the contract set no date for completion of construc-
tion strengthens another argument in support of the trial court's
findings. Standard offered testimony that it advised National
against working the crews overtime and continuing winter con-
crete work because Standard felt that both practices were too
expensive and that overtime work had an adverse effect on its rela-
tionship with the labor unions. The trial court properly could have
found that these practices were continued only because of National's
insistence that construction be completed at the earliest possible
date and its declarations of willingness to pay the additional costs.

■ The record includes considerable testimony indicating that
change orders were frequently handled without regard to the method
of procedure demanded by the contract. It indicates that plan
changes often were requested verbally or even by telephone although
the contract required that they be written except in the case of
minor changes or emergency. The record further indicates that
the architect never prescribed the manner in which the contractor
was to keep accounts of the costs of change orders as the contract
authorized him to do. It is our opinion under the facts and circum-
stances here that National is not now in a position to urge that
Standard's failure to conform to these provisions precludes its
recovery. Meyer v. Berlandi, 53 Minn. 59, 54 N. W. 937; Walberg v.
Jacobson, 143 Minn. 210, 173 N. W. 409; Evensta v. St. Olaf College,
173 Minn. 360, 217 N. W. 348.

■ Standard requests additional attorneys' fees on this appeal.
Since M. S. A. 514.14 does not expressly provide for attorneys' fees
on appeal in a mechanic's lien case, we hold that such fees are not
to be allowed. Barrett v. Hampe, 237 Minn. 80, 53 N. W. (2d) 803.
The general rule appears to be that attorneys' fees on appeal in an
action to foreclose a mechanic's lien are not allowed in the absence
of express legislation. Hendrix v. Gold Ridge Mines, Inc. 56 Idaho

326, 54 P. (2d) 254; cf. Flint v. Bronson, 197 Wash. 686, 86 P. (2d) 218; Barrett v. Hampe, *supra*.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the evidence is insufficient to support a finding that Standard furnished extra labor and material for compaction at a cost of $71,815.66. It appears conceded and the trial court found that extra work or labor called for by defendant was to be provided by Standard on a "cost-plus" basis. This would imply that Standard had the burden of establishing the actual cost of such labor and material in furnishing any extras on the project. The trial court found that 44,454 cubic yards of machine compaction had cost Standard $1.50 per cubic yard and 3,699 cubic yards of hand compaction had cost it $4 per cubic yard.

Standard concedes that its books do not furnish sufficient basis to substantiate the amount claimed and submitted expert evidence as to the "value" of the compaction work done. It placed the blame for its inadequate accounts on defendant for refusing to permit the hiring of additional personnel for maintenance of a cost accounting system, but this would hardly be sufficient to relieve it of the burden of establishing actual costs as required, particularly where it kept accurate records of all its costs and disbursements in connection with the contract.

Defendant offered the testimony of a certified public accountant who submitted in evidence an audit of the cost records of Standard from which he had segregated all items that could possibly have related to the compaction. From these he drew the conclusion that the whole compaction process had actually cost Standard 31 cents per cubic yard or a total of $16,989.90. Witnesses submitted by Standard in opposition to his testimony were unable to demonstrate any substantial error in his method of computation or to explain the difference between the costs found by him from Standard's books and those later determined by the court. The auditor was able to make direct reference to entries from Standard's books to substan-

tiate his testimony, and the methods he followed in arriving at cost figures were not seriously challenged.

Standard's president, Thor Knutson, testified that he originally figured 30 to 35 cents per cubic yard for compaction. Sidney Hanson, Standard's chief estimator, testified that the figure of 35 cents per cubic yard had been allowed for compaction on the original quantities figured by Standard's general superintendent. Standard's auditor testified that defendant was credited for certain compaction on the basis of 35 cents per cubic yard, since that constituted the basis of Standard's original bid.

Evidence was submitted that on a similar contracting project, in which Standard was involved with "Red Owl Company" in a location only a few blocks away from defendant's building, Standard had sublet the compaction to a reliable contractor on the basis of 34 cents per cubic yard, including excavating and grading as well. It would seem unreasonable to hold that Standard's unit cost of 35 cents per cubic yard for compaction on defendant's project, as covered in its original estimate, did not cover all its costs on this item.

Exhibit 33 submitted by defendant established that Standard in its original contract and in 17 change orders subsequently submitted had agreed to do all earth handling work for $62,232.03, a figure which included $19,427.84 for compaction. The actual cost of all earth handling, including compaction, excavating, backfilling, and grading, as shown by Standard's books and records, amounted to $66,756.96. Under such circumstances, the trial court's finding that an additional $71,815.66 had been expended by Standard for compaction alone does not seem justified.